RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DAZHAN C. MCCALLISTER,

*Defendant-Appellant*.

No. 21-4011

────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron;
No. 5:20-cr-00653-1—Patricia A. Gaughan, Chief District Judge.

Argued: June 7, 2022

Decided and Filed: July 7, 2022

Before: McKEAGUE, NALBANDIAN, and READLER, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Edward R. LaRue, EDWARD R. LARUE INC, Cleveland, Ohio, for Appellant. Elizabeth M. Crook, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Edward R. LaRue, EDWARD R. LARUE INC, Cleveland, Ohio, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

────────────────

## OPINION

────────────────

CHAD A. READLER, Circuit Judge. Officers suspected a group of men gathered in a public park of smoking marijuana. So the officers stopped many of them, including Dazhan McCallister. After the stop, an officer recovered a pistol from McCallister's waistband. McCallister moved to suppress that evidence on the basis that the pistol was discovered after an

unlawful search and seizure.  The district court denied the motion, and, following final judgment, McCallister appealed.  We now affirm.

**I.**

Talbot Whitney Park is a small rectangular park "tucked away in a residential neighborhood" in Akron, Ohio.  Akron Police Department officers consider the park "a high-crime area" due to the frequent presence of firearms, drugs, and violent crime there.  For example, the day before the events at issue here, an officer recovered a gun and drugs from the park.  Days earlier, the Department received a video depicting several men in the park brandishing assault rifles and pistols.

That takes us to the day in question.  The Department received an anonymous call that a group of men was smoking marijuana in the park.  Marijuana is an illegal drug under both federal and, save for stringently regulated medical usage, Ohio law.  *See* 21 U.S.C. § 812(b)(1); Ohio Rev. Code Ann. §§ 2925.11, 3796.01–.31; Ohio Admin. Code § 4729:9-1-01(D)(23).  An officer drove by and observed a group in the park.  Several hours later, an undercover officer confirmed that a group of at least ten people was still there.  Neither officer, however, got close enough to determine if the group was smoking marijuana.

Back at the Department, Detective Magaw organized several officers, including Detective Elam, to investigate the happenings at the park.  Officers arrived at the park in the early evening.  Consistent with previous reports, the officers observed a group of ten to 15 men, including McCallister, gathered together.  According to the officers, many of the men were in close proximity of each other, congregating as a group.  As the officers approached the group, they detected the odor of marijuana.  So the officers began stopping people.  Four men, including McCallister, tried to walk away.  An officer pointed at McCallister and the three other men, instructing them to stop moving and place their hands on their heads.  McCallister did so.

Immediately after McCallister was stopped, Elam saw him "huddled in the group" with a "little bump out on his shirt" on his right side, which the detective concluded was a gun.  In addition, Elam observed McCallister "turn[] his body in towards the huddle so no one would see what's in front of him or see anything on the sides of him."  Elam asked McCallister if he was

carrying any weapons; McCallister did not respond. As McCallister raised his hands, his shirt lifted, and Elam saw a firearm magazine tucked into McCallister's waistband. Elam retrieved the gun—a Glock 9mm pistol with an installed conversion device—making it an illegal machinegun.

McCallister was indicted on one count of illegal possession of a machinegun, 18 U.S.C. § 922(o), and one count of possessing an unregistered firearm, 26 U.S.C. § 5861(d). At his initial appearance, McCallister pleaded not guilty. He filed a motion to suppress the Glock, which the district court denied. McCallister then pleaded guilty to both counts, preserving his right to appeal the suppression ruling. After the district court entered final judgment, McCallister timely appealed the denial of his suppression motion.

**II.**

McCallister believes that the Glock is inadmissible because it was discovered as a result of an unconstitutional search and seizure. To that end, he challenges several of the district court's factual findings that informed its suppression ruling (which we review for clear error) as well as the district court's legal conclusion that no Fourth Amendment violation occurred (which we review de novo). *United States v. Powell*, 847 F.3d 760, 767 (6th Cir. 2017).

A. Start with the district court's factual findings. Under the "highly deferential" clear error standard of review, we must affirm the district court's findings of fact unless we are "left with the definite and firm conviction that a mistake has been committed." *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc) (citation omitted), *aff'd*, 140 S. Ct. 719 (2020). A district court does not clearly err "so long as the finding is 'plausible in light of the record viewed in its entirety.'" *United States v. Grant*, 15 F.4th 452, 457 (6th Cir. 2021) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

McCallister challenges three factual findings. The first is the finding that McCallister was part of the group gathered in the park. With both officers having testified that McCallister stood close to the others, testimony that was corroborated by body camera footage, we see no clear error in the district court's assessment.

The second is the finding that officers smelled marijuana near where McCallister stood. Here too, sufficient evidence supports the district court's finding. Magaw testified that the officers smelled marijuana as they approached the group in the park, with McCallister standing in the middle of that group. *See United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021) (affirming the district court's finding that officers detected the odor of marijuana where an officer recalled smelling marijuana). Whether the odor instead could have been from a legal substance like hemp, as McCallister suggests, at best presents us with "two permissible views of the evidence"—the officers smelled a substance that could have been illegal or legal. *Anderson*, 470 U.S. at 574. That is an insufficient basis upon which to reverse a district court's factual finding. *Id.*

The third challenged finding is that an undercover officer confirmed that the men in the park were smoking marijuana. Any such finding is irrelevant to our *Terry* analysis, as the record reveals that once the officers arrived at the park, they smelled marijuana, confirming the anonymous tip prior to the stop. But in any event, the district court did not reach the conclusion McCallister describes. Rather, it found that the undercover "officer confirmed that a group of males was hanging out in the park," a finding consistent with the officers' testimony. True, the district court in one instance stated more generally that "[a]n undercover officer confirmed the complaint," which reported both that a group of men was in the park and that they were smoking marijuana. Yet it is not entirely clear if that sentence refers to the entire tip or merely to the part indicating the group's location. Perhaps the district court was imprecise. But imprecision alone is not enough for us to conclude that the district court committed clear error. *See Taglieri*, 907 F.3d at 409 (stating that a finding is clearly erroneous only where it "strike[s] us as wrong with the force of a five-week-old, unrefrigerated dead fish" (citation omitted)).

B. Next up are McCallister's challenges to the district court's conclusion that the search and seizure were lawful. The Fourth Amendment's prohibition on "unreasonable . . . seizures," U.S. CONST. amend. IV, allows temporary investigative detentions, known as *Terry* stops, so long as there is "a reasonable suspicion supported by articulable facts that criminal activity may be afoot," *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation marks omitted); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). The Fourth Amendment's prohibition on "unreasonable

searches," U.S. CONST. amend. IV, likewise permits precautionary searches for weapons following a lawful *Terry* stop, known as *Terry* frisks, where there is "reasonable suspicion that the person searched may be armed and dangerous," *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (quotation marks omitted); *see also Terry*, 392 U.S. at 30. Reasonable suspicion, however, is not self-defining. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Rather, it is an "elusive" concept, *id.*, one that "is not readily, or even usefully, reduced to a neat set of legal rules," *Sokolow*, 490 U.S. at 7 (quotation marks omitted).

Accordingly, several principles guide our evaluation of reasonable suspicion. In the context of a *Terry* stop, "the degree of suspicion" required, *id.* at 10 (citation omitted), relatively speaking, is quite low: "a moderate chance of finding evidence of wrongdoing," *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370–71 (2009) (recognizing that school searches require "reasonable suspicion" to be constitutional, distinguishing reasonable suspicion from probable cause, and then describing the reasonable suspicion standard); *see also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (describing reasonable suspicion as "a minimal level of objective justification"); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (holding that *Terry*'s "reasonable suspicion" standard is used to determine if a school search was constitutional); *United States v. Noel*, 659 F. App'x 284, 288 (6th Cir. 2016) (applying the "moderate chance" description of the reasonable suspicion standard to hold that a warrantless search by a probation officer was lawful); *United States v. Hilton*, 625 F. App'x 754, 758 (6th Cir. 2015) (same). By way of explanation, consider other standards. Reasonable suspicion, for instance, "is obviously less demanding than . . . probable cause," *Sokolow*, 490 U.S. at 7, which itself "is not a high bar" and one that requires only a "substantial chance of criminal activity," *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citations omitted). And both reasonable suspicion and probable cause fall below the preponderance of the evidence standard, *Sokolow*, 490 U.S. at 7, which requires criminal activity to be "more likely than not," *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020) (citation omitted). Still, reasonable suspicion mandates more than "a mere hunch or intuition," *Jones v. City of Elyria*, 947 F.3d 905, 913 (6th Cir. 2020), in other words, more than a "gut feeling," *United States v. Keith*, 559 F.3d 499, 503 (6th Cir. 2009) (citation omitted).

To determine whether there was a sufficient degree of suspicion to justify a *Terry* stop, we consider the totality of the circumstances. *Sheckles*, 996 F.3d at 343. That includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers. *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008). The totality of the circumstances also involves "commonsense judgments and inferences about human behavior," *Wardlow*, 528 U.S. at 125, as well as inferences the officer may draw based on his "experience and specialized training," *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Even entirely innocent behaviors may establish reasonable suspicion in some circumstances. *Sokolow*, 490 U.S. at 9–10. Suffice it to say, when making a reasonable suspicion inquiry, we take the facts together, framing an entire picture. *Cf. Arvizu*, 534 U.S. at 274 (rejecting a "divide-and-conquer analysis" where a court concludes each individual fact is "entitled to 'no weight'" because it is "readily susceptible to an innocent explanation" (citation omitted)).

Finally, "the detaining officers must have a particularized . . . basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417–18; *see also Kansas v. Glover*, 140 S. Ct. 1183, 1190 n.1 (2020). "Uncommon" or "unique" facts are not required to justify a stop so long as the totality of the circumstances indicates that there is reasonable suspicion that the suspect himself was engaged in wrongdoing. *United States v. McCauley*, 548 F.3d 440, 444 (6th Cir. 2008).

The same principles apply to *Terry* frisks, which require reasonable suspicion that the suspect is armed and dangerous. *Pacheco*, 841 F.3d at 390–91. Long story short, we view the totality of the circumstances through an objective lens, asking whether there was a moderate chance, arising from articulable facts and inferences, that the person stopped was engaged in criminal activity (*Terry* stop) and was armed and dangerous (*Terry* frisk).

*The Initial Stop.* Was there a moderate chance that McCallister had smoked marijuana? Looking at the totality of the circumstances, we conclude that the answer is yes.

The Department received an anonymous report that a group of men was smoking marijuana in the park. Anonymous tips, standing alone, can, depending on the nature of the tip, satisfy the reasonable suspicion standard. *See Navarette v. California*, 572 U.S. 393, 398–400

(2014) (holding that an anonymous 911 call alone established reasonable suspicion because the information indicated that the caller had eyewitness knowledge and contemporaneously observed the reported illegal activity); *Robinson v. Howes*, 663 F.3d 819, 829–30 (6th Cir. 2011). Two Akron officers drove by the park and confirmed that a group of people was there. Aware of this tip and those officers' observations, another set of officers arrived at the park and smelled marijuana as they approached McCallister's location. That observation too could lead one reasonably to suspect that McCallister had smoked marijuana. *See United States v. Brooks*, 987 F.3d 593, 599–600 (6th Cir. 2021); *United States v. Freeman*, 412 F. App'x 735, 743–44 (6th Cir. 2010); *United States v. Simpson*, 520 F.3d 531, 543, 545 (6th Cir. 2008); *United States v. Foster*, 376 F.3d 577, 586 (6th Cir. 2004). In addition, the officers knew that the park was a high crime area where drug crimes had occurred as recently as the day before. And after the officers arrived and began stopping members of the group, McCallister tried to walk away, a fair signal that McCallister had something to hide. *See Wardlow*, 528 U.S. at 124; *United States v. Luqman*, 522 F.3d 613, 617 (6th Cir. 2008); *United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006). All things considered, there was at least a moderate chance that McCallister had smoked marijuana.

None of McCallister's arguments undermine this conclusion. It may be, as McCallister suggests, that no fact, standing alone, is sufficient to support a finding of reasonable suspicion. But that possibility has no bearing on an inquiry that considers the "totality of the circumstances." *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019) (citation omitted). Nor is it compelling that the marijuana odor could have been a legal substance, like hemp, instead of illegal marijuana. Reasonable suspicion, remember, does not require proof that the suspect committed a crime. *Embody v. Ward*, 695 F.3d 577, 581 (6th Cir. 2012). And as McCallister concedes the odors of hemp (legal) and marijuana (illegal) are indistinguishable, the odor suggested at least a moderate chance that McCallister smoked marijuana. Equally unavailing is the assertion that McCallister was merely standing near other wrongdoers; officers reasonably suspected that McCallister himself had smoked marijuana, not merely that he stood near others who had done so. *See United States v. Garza*, 10 F.3d 1241, 1245–46 (6th Cir. 1993) (rejecting a defendant's guilt-by-proximity argument because the officers reasonably suspected that the

defendant himself was engaged in criminal activity); *see also United States v. Belakhdhar*, 924 F.3d 925, 927–28 (6th Cir. 2019).

That leaves McCallister's contention that because he was in a group, the degree of suspicion that he—as opposed to another in the group—had smoked marijuana was too low to support reasonable suspicion. To our minds, however, the officers had more than a mere hunch that McCallister himself had smoked marijuana. The officers could reasonably suspect that all of the men, not just one, were smoking marijuana together, as they gathered in the park on a warm summer evening. That McCallister (along with three other men) attempted to walk away from the officers after they began to stop members of the group bolstered the officers' reasonable suspicion as to McCallister in particular. Here, we see wisdom in the Eleventh Circuit's decision in *United States v. Roberts*, 849 F. App'x 863 (11th Cir. 2021) (per curiam). Officers conducted a *Terry* stop of Roberts after they smelled marijuana emanating from a group of four or five men, including Roberts. *Id.* at 864. Roberts asserted that the officers lacked individualized reasonable suspicion to justify the stop because the odor of marijuana "emanat[ed] from the group as a whole and not him specifically." *Id.* at 866. Yet the Eleventh Circuit rejected that argument. *Id.* at 867. Because officers "suspected that Roberts himself, and the others in the group, were engaged in a crime," the officers could detain Roberts even though "they could not point to any particular person [in that group] with certainty and say the smell emanated from [him]." *Id.* That reasoning is equally apt here.

*The Frisk.* McCallister also challenges the search that led to the seizure of his Glock. Elam saw both a "bump out" from McCallister's shirt and a firearm magazine in his waistband, leaving "little question [that] the officer was justified" in frisking McCallister. *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam); *see also United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010). Cementing that conclusion is the fact that Elam observed McCallister attempt to hide the weapon by turning his body away from the officers and by not disclosing that he was armed when asked. Finally, Elam knew that there were frequent shootings in the park and that, days earlier, several men had brought firearms into the park. *See United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008). Collectively, Elam's observations and inferences

amounted to reasonable suspicion that McCallister was armed and dangerous. *Terry*, 392 U.S. at 28.

McCallister's arguments to the contrary miss the mark. For one, he is wrong about the relevant standard: *Terry* requires only reasonable suspicion (not probable cause) to justify a frisk. *See Terry*, 392 U.S. at 30. For another, it makes no difference here that firearms may lawfully be carried openly in Ohio. Under *Terry*, after all, officers may frisk a suspect who legally carries a firearm under state law if they reasonably suspect that he is armed and dangerous. *See Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983); *Adams v. Williams*, 407 U.S. 143, 146 (1972); *United States v. Lambert*, 770 F. App'x 737, 741 (6th Cir. 2019). In any event, McCallister did not openly carry the Glock, so we fail to see how Ohio's open carry laws are relevant here. Nor did he legally carry the concealed weapon under then-current Ohio law, as he failed to disclose it to Elam when stopped. Ohio Rev. Code Ann. § 2923.12(B)(1) (2017).

*     *     *     *     *

For the foregoing reasons, we affirm.