NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0006n.06

Case No. 22-3319

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) ) | Jan 04, 2023 DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| IVOREE TINSLEY, | ) ) | COURT FOR THE NORTHERN DISTRICT OF OHIO |
| Defendant-Appellant. | ) ) | O P I N I O N |

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

COLE, Circuit Judge. Ivoree Tinsley appeals the denial of his motion to suppress evidence seized during a warrantless search and evidence later obtained pursuant to a search warrant, the latter of which he claims is fruit of the poisonous tree. Because both searches were lawful, we affirm the district court's denial of Tinsley's motion to suppress.

## I. BACKGROUND

On June 16, 2020, Crime Stoppers, a crime-reporting service with a website and hotline, received the following anonymous tip:

> Ivoree Tinsley, currently out on parole, I have personally witnessed he is in possession of what he is saying was an ex-police shotgun. He said an auction kind of thing 2 weeks ago. I thought it was weird because I knew he was an ex-felon, how could he buy it? When I saw the news that was talking about the Cleveland Police theft, it hit close to him and I really think it is something you should all be aware of. He was selling, but in the last week he said people were not giving what he wanted so he was going to keep it himself. A black Dodge Ram pickup temporary plate and lives at 12504 Forest Avenue. Spends most of his time with a girlfriend on Archwood Avenue. When I first seen the shotgun it was in the house.

> He transported it in his truck to a friend of a friend place to try and sell it. When I saw him again 3 days later it again was in his truck. It is kept in the back extended cab part. I am not in – excuse me. I am not interested in any reward. I do not want to be involved in any way. I am sorry I cannot help with more, but I do feel someone needs to know about this.

(Mot. to Suppress Hr'g Tr., R. 51, PageID 178–79.)

Brett McCort, an officer with the Ohio Adult Parole Authority and member of the FBI Repeat and Violent Offender Enforcement Unit (RAVEN) task force, received the tip the following day. Via law enforcement databases, McCort confirmed that there was an individual named Ivoree Tinsley on parole who resided at 12504 Forest Avenue in Cleveland, Ohio, and owned a black Dodge Ram truck.

McCort then investigated the statement that Tinsley spent most of his time with a girlfriend at a residence on Archwood Avenue in Cleveland. McCort examined the visitation records from Tinsley's prior term of incarceration, and from that list identified Jasmin Caraballo as the potential girlfriend. McCort researched addresses associated with Caraballo, and while he did not find an address on Archwood Avenue, he noticed an address nearby on Storer Avenue. McCort's search also revealed another address associated with Caraballo, 11211 Peony Avenue.

McCort reported the tip to his supervisor, Tinsley's parole officer, and the parole officer's supervisor. McCort was advised to investigate further for contraband in light of the information about the shotgun.

So on June 24, 2020, McCort and other RAVEN officers investigated further. One officer traveled to Caraballo's address at 11211 Peony Avenue, where he spotted Tinsley's black truck. That officer informed McCort and the other RAVEN officers, who soon arrived at the scene. Officers knocked on the door and announced their presence. Caraballo and Tinsley exited the house between five and ten minutes later.

The officers detained Tinsley outside of the residence and patted him down; they found $3,000 in cash and the keys to his truck, which they searched without a warrant. McCort testified at a suppression hearing that the officers executed the search on the understanding that Tinsley was subject to warrantless searches based on reasonable suspicion as a parolee under Ohio law. Following his release from custody in 2019, Tinsley also agreed to certain "Conditions of Supervision," including the following search condition:

> I agree to the warrantless search of my person, motor vehicle, place of residence, personal property, or property that I have been given permission to use, by my supervising officer or other authorized personnel of the Ohio Department of Rehabilitation and Correction at any time.

(Conditions of Supervision, R. 18-1, PageID 57, ¶ 7.) The Conditions also prohibited Tinsley from possessing any firearms or ammunition or violating any other federal or state law.

After the pat-down, the officers searched Tinsley's truck and discovered marijuana, various colored pills, ammunition, and a holster. The officers arrested Tinsley and drove him to Cuyahoga County Jail. They did not search the residence before departing.

While in jail, Tinsley made a few phone calls to Caraballo, which were recorded. On one occasion, Tinsley asked Caraballo to move her daughter's "toys" outside of her residence so that police would not find them. McCort listened to this call, understood "toys" to refer to contraband, and then prepared a warrant to search Caraballo's residence.

In anticipation of the search warrant, several RAVEN officers went to Caraballo's residence, where they observed Caraballo and an unidentified man carrying a bag to a nearby vehicle. Officers confronted Caraballo, who admitted that she and the unnamed man had placed several bags containing firearms in vehicles parked near the residence; officers on the scene reported this information to McCort, who incorporated the vehicles into the search warrant request. A state court judge signed the warrant, and officers searched the residence and vehicles. Officers

found several firearms and a firearm drum magazine, although they never found a weapon matching the shotgun described in the original tip.

A federal grand jury later indicted Tinsley for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and for possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). Tinsley moved to suppress the evidence that officers found when they patted him down and searched his truck without a warrant as violative of the Fourth Amendment, and he sought to suppress the evidence obtained pursuant to the search warrant, arguing that it was fruit of the poisonous tree based on the allegedly unlawful initial search. After a hearing, the district court denied the motion, concluding that the officers had—and needed only—reasonable suspicion of criminal activity to conduct the initial warrantless search, and so both searches were lawful.

Tinsley pleaded guilty to both counts of the indictment. Now, Tinsley appeals, arguing that the district court erred in denying his motion to suppress.

## II. ANALYSIS

In an appeal from a denial of a motion to suppress evidence, we review the district court's findings of fact for clear error and its legal conclusions de novo. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016). We view the evidence "in the light most likely to support the district court's decision." *United States v. Abdalla*, 972 F.3d 838, 844 (6th Cir. 2020) (quoting *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009)).

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend IV. The reasonableness of a search or seizure under the Fourth Amendment generally depends on the totality of the circumstances. *Samson v. California*, 547 U.S. 843, 848 (2006). In evaluating the reasonableness of a search of a parolee in particular, two possible tests may apply,

and the search need meet only one to be lawful. *See United States v. Sharp*, 40 F.4th 749, 752–53 (6th Cir. 2022); *see also United States v. Dunbar*, No. 22-3087, 2022 WL 17245098, at *3–4 (6th Cir. Nov. 28, 2022) (noting applicability of *Griffin* or *Samson* but applying only *Griffin* to evaluate search under Ohio Rev. Code § 2967.131(C)).

Under the first option, the "special needs" test, the search is reasonable if "carried out pursuant to a [state law] that itself satisfies the Fourth Amendment's reasonableness requirement[.]" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). Here, under the relevant statute, Ohio Rev. Code § 2967.131(C), a warrantless search of an "individual" on parole and that individual's "motor vehicle" is lawful if there are "reasonable grounds" to suspect that the individual has violated the law or the conditions of his parole. We previously found this statute constitutional and concluded that its "reasonable grounds" standard mirrors the federal "reasonable suspicion" standard. *See United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003). So if the officers had reasonable suspicion to search Tinsley's person and vehicle, the search meets *Griffin*'s requirements.

Alternatively, under *Samson*, the search is evaluated for reasonableness under the totality of the circumstances; relevant circumstances include an individual's parole status, the language of the search condition he agreed to on receiving parole, and the state's interest in monitoring his post-incarceration conduct. *See Samson*, 547 U.S. at 852–53. As to the first factor, Tinsley's expectation of privacy is "severely diminished" due to his parole status. *Id.* at 852. With respect to the last factor, Ohio has a substantial interest in supervising him and other parolees to reduce recidivism and encourage reintegration into society. *See id.* at 853 (citing *Griffin*, 483 U.S. at 879; *United States v. Knights*, 534 U.S. 112, 121–22 (2001)).

The parties differ slightly regarding whether the search condition in Tinsley's Conditions of Supervision required police to have reasonable suspicion prior to searching him. Tinsley contends that this provision does not allow suspicionless searches and instead requires reasonable suspicion based on Ohio Rev. Code § 2967.131(C)'s "reasonable grounds" standard. Conversely, although the government devotes most of its brief to arguing that the officers had reasonable suspicion for the search, it briefly argues that Tinsley may be subject to a suspicionless search because his Conditions of Supervision allow warrantless searches "at any time." (Appellee Br. 4, 15; Conditions of Supervision, R. 18-1, PageID 57, ¶ 7.)

The search condition here does not specify the level of suspicion required to justify the warrantless search, instead specifying only that the search may happen "at any time." (Conditions of Supervision, R. 18-1, PageID 57, ¶ 7.) But this case does not require us to determine whether the search condition allows for a lower standard than the "reasonable grounds" standard in Ohio Rev. Code § 2967.131(C). Even assuming the officers needed reasonable suspicion to justify the initial search of Tinsley and his truck, the circumstances here supported a finding of reasonable suspicion, and thus the search satisfies either *Griffin* or *Samson*.

The parties agree that the primary basis for reasonable suspicion in this case is the Crime Stoppers tip, and so we begin there. Reasonable suspicion is a lower standard than probable cause, but more than a mere hunch; it requires some particularized grounds for suspecting that the individual has engaged in criminal conduct. *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022). Relevant here, "where a tip contains independently verifiable details . . . that are sufficiently corroborated by the police prior to initiating the seizure of the suspect, reasonable suspicion exists." *United States v. Hudson*, 405 F.3d 425, 432 (6th Cir. 2005) (internal marks and citations omitted).

Here, McCort and other RAVEN task force officers corroborated numerous tip details, starting with Tinsley's parole status, address, and vehicle. Next, McCort identified the alleged girlfriend, Caraballo, and confirmed that she had an address near the Archwood Avenue location the tipster described, as well as another address on Peony Avenue. And on June 24, a few days after the tip came in, another officer corroborated that Tinsley's truck was parked at a residence associated with Caraballo, albeit not the one mentioned in the tip.

Additionally, when officers arrived, knocked, and announced their presence, Tinsley and Caraballo did not immediately exit the residence. While this in and of itself does not belie criminality, Tinsley's delay in exiting the residence could suggest that he was hiding contraband, as indicated in the tip. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (officers can consider potentially "evasive" actions in determining whether reasonable suspicion exists); *United States v. Graham*, 483 F.3d 431, 433, 439–40 (6th Cir. 2007) (observation that defendant appeared to put something under his seat supported reasonable suspicion in context of tip that defendant had a gun). Given the information included in the tip and officers' observations at the residence, there was reasonable suspicion of criminality or a parole violation sufficient to pat Tinsley down under Ohio Rev. Code § 2967.131(C).

During the pat-down, officers found $3,000 in cash, which only added to the reasonable suspicion calculus for the subsequent search of Tinsley's truck. *See, e.g.*, *United States v. Walton*, 258 F. App'x 753, 758 (6th Cir. 2007) (officer's observation of "stack of cash" contributed to reasonable suspicion). Significantly, the finding of cash arguably corroborated an additional element of the tip: that Tinsley had been trying to sell the shotgun and—despite the tipster's conclusion that he had failed to do so—may have succeeded in selling it in the time between the tip and the search. Therefore, the officers also had reasonable suspicion to search Tinsley's truck,

where the tipster stated that contraband was kept, and where they ultimately found more contraband.

Tinsley contends that the officers lacked reasonable suspicion for the pat-down and truck-search because they failed to corroborate any information suggestive of criminality, instead only corroborating innocent details, such as his address, car registration, and whereabouts. But confirmation of the numerous, innocent details here bolstered the reliability of the tip—including its allegations of criminality—by indicating that the tipster had personal knowledge of Tinsley and his activities. *See Navarette v. California*, 572 U.S. 393, 397–98 (2014) (describing how corroboration of innocent details in a tip can indicate that the tip's allegations of criminality are also reliable).

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). In *White*, police received a tip that a woman would leave an apartment complex at a certain time, carrying narcotics in an attaché case to deliver to a motel. *Id.* at 327. The tip in *White* included "virtually nothing from which one might conclude that the caller is either honest or his information reliable" and gave "absolutely no indication of the basis for the caller's predictions" of the defendant's activities. *Id.* at 329 (cleaned up). Nevertheless, that tip gave rise to reasonable suspicion based on its overall indicia of reliability, particularly its predictions of the defendant's movements, which police corroborated. *Id.* at 332.

Although the tip here was not as perfectly predictive as the tip in *White*, its level of detail and predictive value suffice under the reasonable suspicion standard. The tipster here gave much greater detail than the caller in *White* about his or her familiarity with Tinsley and basis of knowledge: The tipster described seeing the shotgun at Tinsley's house and later in his truck, and

also described Tinsley's attempts to sell the shotgun. Likewise, although some of the information about Tinsley could have been verified through online searches—such as his prior conviction—taken together, the facts suggest that the tipster had personal knowledge of Tinsley and his possession of contraband. And like in *White*, at least some aspects of the tip—such as Tinsley's pattern of visiting his girlfriend—were not readily available to the general public. *See id.* at 332.

Overall, the officers had reasonable suspicion that Tinsley was engaging in criminal conduct or a violation of his parole conditions. Therefore, the initial searches of his person and vehicle complied with the Fourth Amendment. Because the initial searches were lawful, the later search pursuant to the search warrant—obtained based on Tinsley's statements in jail—was not fruit of the poisonous tree. *Cf. Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The district court correctly denied Tinsley's motion to suppress.

III.

For the foregoing reasons, we affirm the district court's denial of Tinsley's motion to suppress evidence.