RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0152p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LAVONCE MAKIRI SMITH,

*Defendant-Appellant*.

No. 24-1655

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cr-00108-1—Jane M. Beckering, District Judge.

Decided and Filed:  June 9, 2025

Before:  GILMAN, DAVIS, and MATHIS, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ON BRIEF:**  Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant.  Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

─────────────

## OPINION

─────────────

RONALD LEE GILMAN, Circuit Judge.  Lavonce Makiri Smith moved to suppress evidence of a gun that was recovered from his pocket during a stop on a public street in Grand Rapids, Michigan.  The district court denied his motion.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

# I.  BACKGROUND

## A.    The stop

On an evening in May 2023, Grand Rapids Police Department Detective Garza was involved in an on-duty car accident.  The cars collided near the intersection of College Avenue and Dickinson Street, in a neighborhood that was notorious for narcotics and stolen vehicles.  Lt. Jonathan Wu was also working in the area, and he drove to the scene of the accident.  Because both officers were driving unmarked vehicles and wore plain clothes, Wu requested that a uniformed officer come to the scene to take an accident report.  The young woman driving the other car involved in the accident called her mother, who soon arrived at the scene in another car.

While waiting for a uniformed officer to arrive, Wu saw a silver Chrysler speed down College Avenue past him.  He checked his stolen-vehicle list and matched the Chrysler's license plate to a car that had been reported stolen.  The Chrysler then turned east onto Dickinson Street, running a stop sign.  Wu began to follow the Chrysler in his unmarked car.  At the intersection of College and Dickinson, the Chrysler drove over a concrete barrier meant to direct traffic west and disappeared eastbound on Dickinson Street.  Wu then returned to the accident scene and parked on College Avenue.

Four cars were now parked in a line on College Avenue, just north of the Dickinson Street intersection—these being the cars driven by Wu, Garza, the mother, and the young woman, with Wu's car furthest from the intersection.  Wu remained in his car while talking to Garza, who was standing in the street.  He then saw the Chrysler reappear and move "very slowly" past his car.  Two young Black men wearing face masks sat in the front seat, and they watched Wu as they drove past, giving him the impression that they were "checking [him] out." Wu spotted at least two other occupants in the back seat.  The car continued northbound on College Avenue and disappeared.

Minutes later, Wu saw through his left side mirror that the Chrysler had circled around the block—its third appearance at the scene—and was parked at the intersection of College Avenue and Dickinson Street, about 100 yards behind Wu's car.  The reappearance of the Chrysler and its occupants' apparent focus on Wu's car concerned him.  He knew that stolen cars

were often used in the commission of carjackings and robberies, and his unmarked police car was a high-performance Dodge model that was often targeted in carjackings.

As he turned his attention towards the Chrysler, Wu saw three young Black men, five to ten yards in front of the Chrysler, walking north on College Avenue, away from the Dickinson Street intersection and towards the line of parked cars. Two of the men wore hooded jackets with the hoods pulled up, despite the over 70-degree weather. The third wore a white T-shirt. (*Id*). Based on the timing of their arrival, Wu believed that the men were "associated with" the stolen Chrysler. Two of the men had their hands in their pants pockets while they walked, and the one who was walking in front of the others—later identified as Smith—had one hand concealed in his jacket.

The three men walked past the young woman's car and the mother's car and continued to advance towards Wu's car. As Smith and the others neared Wu's car, they spread out along the street. Wu saw Smith yelling "towards" him, but he could not hear what Smith was saying. Smith was looking "directly at" Wu, and their eyes met in Wu's mirror. Wu feared that the men were armed and that they intended to carjack or rob him. He then yelled to Garza, who was standing in the street, to quickly get in the car, and the two immediately drove northbound on College Avenue. Seconds later, Smith and his companions, who were within a few car lengths of Wu's car when it drove away, turned around and began walking back toward the Chrysler, their hands no longer in their pockets.

Wu relayed this sequence of events and his suspicions to other officers over his radio as he drove. He then put on a ballistic vest and turned around to drive south down College Avenue, towards the scene of the accident. The Chrysler passed him driving north.

By that time, one of the uniformed officers whom Wu had radioed, Officer Juusola, had arrived on the scene and had ordered the three men to the ground at gunpoint. Another officer, Officer Hawley, handcuffed Smith and asked if he "had anything dangerous on him that would hurt me." Smith replied that he did. Hawley then patted him down and retrieved a gun.

**B.      Procedural history**

Smith was charged with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).  He moved to dismiss the indictment on the ground that the police lacked reasonable suspicion to stop and frisk him.  The district court held an evidentiary hearing in December 2023.  Wu testified, and the court found his testimony to be credible.  Following argument from the parties, the court delivered an oral opinion.  It held that the stop was lawful because the officers had a "reasonable suspicion that criminal activity, particularly an armed robbery or carjacking, was afoot," and that the frisk was lawful because, "[b]ased on the totality of the circumstances, the officers reasonably suspected Mr. Smith was armed and dangerous when they detained him."

Smith subsequently entered a conditional plea of guilty, preserving his right to challenge the district court's suppression decision on appeal.  This timely appeal followed Smith's sentencing hearing, in which the district court imposed a sentence of 51 months of imprisonment.

## II.  ANALYSIS

**A.      Standard of review**

"When a defendant appeals the denial of a motion to suppress evidence, we review the district court's findings of fact under the clear-error standard[,] and we review its conclusions of law de novo."  *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019).  Because the court denied Smith's motion, "we review all evidence in the light most favorable to the government." *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009); *see also United States v. Huff*, 630 F. App'x 471, 476, 498 (6th Cir. 2015) (applying the clear-error standard to factual findings based on video evidence).  We may affirm the district court's ruling "on any ground supported by the record."  *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016).

**B.      The stop was supported by reasonable suspicion**

The Fourth Amendment permits temporary seizures when police have "a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting *United States v. Sokolow*, 490 U.S. 1, 7

(1989)).  "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004)).

The totality of the circumstances "includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers," plus "commonsense judgments and inferences about human behavior" and "inferences the officer may draw based on his experience and specialized training."  *McCallister*, 39 F.4th at 374 (citations and internal quotation marks omitted).  On the other hand, "'an inchoate and unparticularized suspicion or hunch' will not suffice."  *United States v. Taylor*, 121 F.4th 590, 595 (6th Cir. 2024) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).  But the threshold for reasonable suspicion is "quite low: a moderate chance of finding evidence of wrongdoing" is sufficient.  *McCallister*, 39 F.4th at 373 (citations and internal quotation marks omitted).

The circumstances in the present case meet that low bar.  Wu's reasonable suspicion that Smith intended to carjack or rob him was supported by articulable facts and permissible inferences from those facts.  First, and perhaps most important to our analysis, Wu made the "commonsense judgment[]," *see id.* at 374, that Smith and his companions had come out of the stolen Chrysler.  Wu had previously observed at least two "younger black males," like Smith and his companions, in the Chrysler, the Chrysler reappeared and parked down the street just before Wu saw the men walking towards him, and the men were walking from the direction of the Chrysler.  They were also quite close to the Chrysler—only five to ten yards away from it—when Wu first noticed them.

In addition to being stolen, the Chrysler attracted Wu's attention because of its movements:  Wu saw the car reappear at the scene twice before parking down the street, and he had previously observed the Chrysler's occupants watching him as the car passed by.  Wu knew from his training and experience that stolen cars were often used in the commission of other offenses like carjackings and robberies.

Second, the behavior that Wu observed as the men walked down the street bolstered the suspicion that they were intending to engage in criminal activity and that they were associated with the stolen car. As they neared Wu's car, the men spread out. Smith made eye contact with Wu in the car mirror and yelled something in his direction. Each of the men had one hand obscured in his pants or hoodie. And just seconds after Wu and Garza drove away, the men turned around and walked back towards the Chrysler, now with their hands removed from their pockets. All of this took place in a high-crime area that had seen previous carjackings, and Wu's unmarked car was a model that was frequently stolen. *See United States v. Smith*, 594 F.3d 530, 540 (6th Cir. 2010) (holding that a defendant's presence in a high-crime area may be considered in the reasonable-suspicion analysis (citing *Wardlow*, 528 U.S. at 124)). Taken together, the totality of the circumstances gave rise to a reasonable suspicion that Smith and his companions intended to carjack or rob Wu.

Smith, however, takes issue with the district court's factual findings. He argues that the court committed clear error by crediting Wu's testimony despite Wu not being a reliable narrator. According to Smith, Wu made his observations through a biased lens and "s[aw] what he wanted to see." Smith posits that the source of this bias was Wu's assumption that the men had come out of the stolen Chrysler, combined with Wu's experience as a police officer, and, somewhat paradoxically, his "relative inexperience" with carjackings, which led him to "overreact."

True enough, police officers, like all of us, are vulnerable to cognitive biases that distort perceptions. We acknowledge that those biases oftentimes include harmful assumptions about young Black men like Smith. But cognitive bias arising from one's background, without more, does not automatically render a witness's testimony unreliable. And "[t]here 'can virtually never be clear error' where the 'trial judge's finding is based on his decision to credit the testimony'" of a witness who has "'told a coherent and facially plausible story that is not contradicted by extrinsic evidence,' and where that finding is 'not internally inconsistent.'" *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)).

Smith's efforts to challenge the district court's factual findings are unavailing. Beyond questioning the reliability of Wu's testimony generally, Smith attempts to paint several of Wu's

specific observations or judgments as improbable or inconsistent.  Smith argues, for instance, that Wu could not have discerned that Smith was looking "directly at" him, let alone the supposed intensity of Smith's stare, because Smith was "hundreds of feet" from Wu and Wu was looking at him through a car mirror.  But by the time that Wu drove off, Smith was only a few car lengths away from him.  From that distance, even through a mirror, we find nothing improbable in Wu having been able to make out both Smith's facial expression and the focus of Smith's gaze.

Smith also takes issue with Wu's conclusion that the men were walking "at" Wu's car, in contrast to the view from the surveillance video that the men were walking in the middle of the street and that Smith veered towards the opposite side of the street as he neared Wu's car.  But given that the men were walking in the direction of Wu's car and that Smith was looking at Wu, the district court acceptance of Wu's characterization of the events does not rise to the level of clear error.

Smith also argues that Garza's conduct at the scene suggests that Garza did not share Wu's conclusion that the men intended to carjack Wu, thereby casting doubt on Wu's perception.  He points out that Garza remained in the street as the men approached and that Garza "apparently did not perceive any statements made by Lavonce Smith to be threatening."  Garza's lack of a visible reaction to the unfolding circumstances, however, does not qualify as either a "contradict[ion] by extrinsic evidence" or an "internal[] inconsisten[cy]."  *See Brooks*, 626 F.3d at 897 (internal quotation marks omitted).  As an initial matter, the record shows that Garza in fact perceived a threat.  Garza's report of the incident includes his belief that the men were armed and that they planned to carjack Wu.

In any event, the question before us is not whether Garza agreed with Wu's assessment of the situation.  Our task is simply to determine whether *Wu* had a reasonable suspicion that criminal activity was afoot.  We conclude that he did.  If Garza did not share that suspicion, either because he did not have knowledge of precisely the same facts that Wu did, or simply because he drew different subjective inferences from those facts, that would not undermine our conclusion.

Moving on from the district court's factual findings, Smith takes issue with its application of the law.  He argues that Wu's association of the three men with the stolen car was a mere "hunch," *see Taylor*, 121 F.4th at 595, and points out that "[i]n truth, there was *no connection* between the three young men and the stolen car."  But far from a hunch, Wu's inference that the men had come out of the car was supported by objective, articulable facts.  The three men matched the basic description of the men whom Wu had seen in the Chrysler's front seat.  He noticed them walking just yards away from the Chrysler at the same time that he noticed the car's reappearance.  And when Wu drove away, the men immediately retreated towards the Chrysler.  In addition, the men's behavior in the street and the car's repeated circling around the scene further bolstered the association between the men and the car.

Nor is the reasonable-suspicion analysis dependent on whether Smith and his companions in fact emerged from the Chrysler.  *See, e.g.*, *United States v. Mundy*, 591 F. App'x 320, 323 (6th Cir. 2014) ("That his suspicion of a break-in turned out to be incorrect does not negate the reasonableness of his decision to stop and investigate.").  What matters is that Wu reasonably inferred their emergence.  Moreover, Wu's reasonable suspicion that criminal activity was afoot did not rest entirely on his initial inference that the men had come out from the Chrysler.  It was instead based on the totality of the circumstances.

Smith also attacks in a piecemeal fashion the various factors giving rise to reasonable suspicion, arguing that each is insufficient on its own.  But this tactic cannot overcome a finding of reasonable suspicion based on the totality of the circumstances.  "A divide-and-conquer analysis—where each factor is singled out and the court engages in a post-hoc search for an innocent explanation—is not permitted." *United States v. Pacheco*, 841 F.3d 384, 387 (6th Cir. 2016) (citations and internal quotation marks omitted).

Smith, for instance, argues "[t]hat a young black man wearing a black hoodie [who] has his hands in his pockets does not give rise to a reasonable suspicion of criminal activity."  He is correct that hoodies and obscured hands, standing alone, would not constitute sufficient grounds on which to base a finding of reasonable suspicion.  We also share Smith's concern that young Black men wearing hoodies are often stereotyped, by law enforcement and others, as "up to no good."  But in the present case, Wu's reasonable suspicion was based on many other articulable

facts—including facts giving rise to an inference that the men were associated with a stolen car whose occupants appeared to be casing the scene. As the district court explained, "[i]f we did not have a stolen vehicle circling this area on multiple occasions," the "outcome would be different . . . . [T]hree individuals walking down the street . . . whether they're wearing hooded sweatshirts, whether they have their hands in their pockets, it would not be enough" to give rise to reasonable suspicion.

The same analysis applies to Smith's protestation "that [Smith] yelled or said *some unknown thing* is a very slender reed on which to base a finding of reasonable suspicion of criminal activity." We again note that Wu's reasonable suspicion did not arise from this factor alone, but rather from the totality of the circumstances.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.