RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NATHANIEL T. TAYLOR,

*Defendant-Appellant*.

No. 23-5344

───────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cr-00020-1—Katherine A. Crytzer, District Judge.

Decided and Filed:  November 15, 2024

Before:  COLE, MATHIS, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Jarrod J. Beck, LAW OFFICE OF JARROD J. BECK, Lexington, Kentucky, for Appellant.  Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge.  A police officer stopped Nathaniel Taylor for speeding on an interstate in Knoxville, Tennessee.  Based on Taylor's supposed suspicious activities during the traffic stop, the officer requested a K-9 unit to conduct a dog sniff.  The dog sniff suggested the presence of drugs in Taylor's vehicle.  This gave law enforcement probable cause to search Taylor's vehicle.  The search did not uncover drugs.  But it did lead to the discovery of a firearm,

which presented a problem for Taylor because, as a felon, he could not lawfully possess a firearm.

After a grand jury indicted Taylor for being a felon in possession of a firearm, he moved to suppress evidence from the search that led to the discovery of the firearm, arguing that the officer did not have reasonable suspicion to detain him beyond the time necessary to issue him a traffic citation.  The district court denied Taylor's motion to suppress.  Taylor appeals the denial.  Because the officer did not have reasonable suspicion to prolong the traffic stop, we reverse the district court's denial of Taylor's motion to suppress.

**I.**

At all pertinent times, Officer Kristen Cox worked in the traffic services unit of the Knoxville Police Department's drug interdiction team.  In that role, Officer Cox spent most of her time patrolling the interstate in the Knoxville, Tennessee, area "stopping cars all day long . . . looking for any narcotics or criminal activity."  R. 25, PageID 185.

On January 21, 2019, Officer Cox stopped Taylor for speeding on Interstate 275.  Officer Cox's dashcam video captured the salient points of the stop.  It began as a routine traffic stop.  Officer Cox walked to the passenger side of Taylor's vehicle and told Taylor that she stopped him because he was driving 69 miles per hour, 14 miles per hour above the speed limit.  Taylor volunteered information that he was coming from a job interview at a nearby Culver's restaurant.  Officer Cox did not ask Taylor where he was headed, and he did not offer that detail.  She asked for his license and proof of insurance.  Taylor handed his license to Officer Cox, but he struggled to locate his insurance information.  Taylor initially reached into his glove box to find his insurance paperwork and then quickly checked his center console.  Before Officer Cox returned to her patrol car to check Taylor's records and driver's license, she noticed several air fresheners on his gear shift.  Officer Cox told Taylor that he could continue searching his vehicle for proof of insurance and informed him that he could avoid a ticket if he found such proof.

Back in her patrol car, Officer Cox checked Taylor's records and discovered that he had a criminal history involving weapons, assaults, and simple possession of drugs.  Meanwhile, she

also observed him making large reaching movements in his car, which she acknowledged were consistent with rummaging for the proof of insurance that she asked him to look for.

Taylor eventually found documentation and flagged down Officer Cox by waving his hand and insurance paper out of the driver's side window. When Officer Cox returned to Taylor's vehicle, Taylor handed her an insurance bill, which Officer Cox accepted as sufficient documentation. Officer Cox informed him that she would not ticket him for driving without insurance. She also told Taylor not to make any further movements because he was making her nervous. But Officer Cox also acknowledged that the movements were because "[Taylor] was doing what [she] asked." R. 23, Ex. 3B, 10:00-10:15.

Officer Cox returned to her patrol car to prepare Taylor's speeding ticket. At that time, she requested a K-9 unit, stating that Taylor's travel plans, criminal history, and air fresheners were the "only reason[s]" she wanted a dog to sniff around Taylor's vehicle. While awaiting the K-9 unit, Officer Cox finished writing Taylor's traffic citation. When the K-9 unit arrived several minutes later, Officer Cox removed Taylor from his vehicle and patted him down, and the dog sniff ensued. The dog indicated the presence of drugs in the car. A search of the car did not reveal any drugs, but the officers ultimately discovered a firearm in the trunk.

A grand jury indicted Taylor for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Taylor moved to suppress the evidence found during the search, arguing, among other things, that there was no reasonable suspicion that Taylor was engaged in criminal activity when Officer Cox prolonged the stop. The district court denied Taylor's motion to suppress. Taylor conditionally pleaded guilty, reserving his right to appeal the district court's ruling on the motion to suppress.

## II.

We apply a mixed standard of review to a district court's ruling on a motion to suppress. "[W]e review findings of fact for clear error and legal conclusions de novo." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (quotation omitted). Whether an officer had reasonable suspicion to justify extending a traffic stop is a mixed question of law and fact, which we review de novo. *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015) (citation omitted).

When the district court has denied the motion, "we consider the evidence in the light most favorable to the government." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citations omitted).

## III.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop constitutes a "seizure" under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The reasonableness of a traffic stop depends on whether the police have reasonable suspicion to believe that a traffic violation has occurred. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

A traffic stop that is constitutionally inbounds at its inception could eventually impinge on the vehicle occupant's rights in some circumstances. If an officer executes a traffic stop unreasonably, the stop could violate the Fourth Amendment rights of the person seized. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "A lawful traffic stop must therefore be limited in scope and duration." *United States v. Whitley*, 34 F.4th 522, 529 (6th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). An officer needs reasonable suspicion to prolong a traffic stop beyond what is necessary to resolve the initial reason for the stop. *Rodriguez*, 575 U.S. at 354–55.

We consider below whether Officer Cox had reasonable suspicion to stop Taylor's vehicle and, if so, whether she had reasonable suspicion to detain him further after she completed the tasks necessary to resolve the initial stop.

## A.

Officer Cox had reasonable suspicion to initiate a traffic stop of Taylor's vehicle. Specifically, Taylor was speeding because he was driving more than the 55 miles-per-hour speed limit posted on Interstate 275. *See* Tenn. Code Ann. § 55-8-152; *United States v. Hill*, 195 F.3d 258, 265 (6th Cir. 1999). Taylor does not dispute this conclusion. So we must address whether

Officer Cox had reasonable suspicion to detain Taylor further after resolving the speeding violation.

**B.**

To continue detaining Taylor after the time that was necessary to complete the traffic citation, Officer Cox needed reasonable suspicion of wrongdoing (other than speeding). *Rodriguez*, 575 U.S. at 350. As both parties agree and as the district court recognized, Officer Cox extended the stop beyond the time necessary to issue a traffic citation.

What could give Officer Cox reasonable suspicion to prolong her stop of Taylor? Officer Cox needed "a particularized and objective basis for suspecting [Taylor] of criminal activity." *See Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quotation omitted). "[R]easonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (internal quotation marks omitted). That said, "an inchoate and unparticularized suspicion or hunch" will not suffice. *Id.* at 124 (internal quotation marks omitted). The reasonable-suspicion standard requires accounting for "the totality of the circumstances—the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "That includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). It also "involves commonsense judgments and inferences about human behavior, as well as inferences the officer may draw based on his experience and specialized training." *Id.* (internal citations and quotation marks omitted). "Even entirely innocent behaviors may establish reasonable suspicion in some circumstances." *Id.*

According to the government, several facts that Officer Cox learned during the indisputably permissible part of the stop gave her reasonable suspicion to prolong the stop to await the K-9 unit. Those facts include: (1) Taylor's travel plans; (2) Taylor's criminal history involving firearms and narcotics; (3) multiple air fresheners on Taylor's gear shift; and (4) Taylor's odd movements while searching for proof of insurance. In analyzing these facts, we cannot use a "divide-and-conquer" approach. *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

That is, we cannot review each factor in isolation from the other factors. Still, we must examine the factors "in some orderly fashion, which typically involves a brief discussion of each factor and its weight in the analysis." *United States v. Smith*, 263 F.3d 571, 591 (6th Cir. 2001).

Start with Taylor's travel plans. In the reasonable-suspicion analysis, we have afforded significant weight to conflicting or implausible explanations of travel plans in some cases. *See United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023); *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002). Here, after learning that Taylor had just come from a job interview, Officer Cox "didn't feel like he took the most efficient route to get" to the address on his driver's license. R. 25, PageID 224. But Officer Cox never asked Taylor where he was going. In fact, she admitted that she just made a guess about where Taylor was headed.

We faced a similar situation in *Smith*. During the *Smith* traffic stop, the officer noticed that neither occupant was listed as an authorized driver on the rental car agreement and that the vehicle had been rented four days earlier. 263 F.3d at 592. The officer accepted the driver's explanation that his wife had rented the car and he had traveled to Arkansas to look at car haulers for his business, and the officer did not pursue any further questions about the occupants' travel plans, destination, or business. *Id.* Given the officer's failure to pursue further questioning, we held that there were no inconsistencies developed in the travel plans that would support reasonable suspicion of illegal activity. *Id.* Likewise, Officer Cox elicited no inconsistencies in Taylor's travel plans because she never asked about his destination. There was nothing inherently implausible about Taylor's stated travel plans, and Officer Cox acknowledged that she based her suspicions of his plans on merely a hunch. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). We thus give any perceived oddities about Taylor's travel plans little to no weight in the reasonable-suspicion calculus.

Next, we turn to Officer Cox's awareness of Taylor's criminal history. The role of a defendant's criminal history in the reasonable-suspicion determination is not linear and may "point in both directions." *United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012). A defendant's criminal history may "cast[] a suspicious light on the otherwise weaker indicators" of illegal activity, rather than serving as a justification for an extended detention itself. *Id.* Officer Cox learned that Taylor had a criminal history involving firearms and drugs, but nothing

related to the sale or delivery of drugs. Although Officer Cox testified that she did not suspect any specific criminal activity, it is reasonable that a prior weapons conviction could create a safety concern or suspicion of illegal activity. *See Townsend*, 305 F.3d at 544–45 (prior record of weapons charges justified a brief search for weapons but did not contribute to other suspicions). Thus, we give Taylor's criminal history some weight.

What about the presence of multiple air fresheners hanging from the gear shift of Taylor's vehicle? We have explained that the strong smell of an air freshener in a vehicle may be consistent with an attempt to mask an incriminating odor but nevertheless has "lesser significance" in the reasonable-suspicion analysis. *United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008). Like the value of a defendant's criminal history, the strong odor of air fresheners during a traffic stop plays more of a supporting role to other, stronger indicators of criminal activity in making the reasonable-suspicion determination. *Id.* But here, there is no evidence of an odor, rendering the presence of air fresheners even less probative. Officer Cox did not indicate a strong smell of air fresheners, any trace odor of marijuana, or any other suspicious scent in Taylor's vehicle. Quite the opposite: she said she did not "smell anything." R. 23, Ex. 3B, 12:55–13:09. Rather, she merely observed that Taylor had several air fresheners on his gear shift. So we give little weight to the air fresheners on the gear shift of Taylor's vehicle.

Finally, we arrive at Taylor's movements. As an initial matter, we must outline the undisputed circumstances in which Officer Cox noted her apprehension to Taylor's movements as it frames our analysis. When Officer Cox first approached Taylor, she asked him to search for insurance documentation and informed him that he could avoid a ticket if he found such documents while she went back to her patrol car. Given that instruction, Officer Cox testified that she "expected some movement" from Taylor but that his movement "was not common" or "what [she's] used to." R. 25, PageID 201. Taylor found an insurance bill that Officer Cox accepted as sufficient documentation, and Officer Cox informed him that she would not issue a ticket for driving without proof of insurance. Officer Cox then instructed Taylor to stop moving and "digging around" in his car because those movements "make [her] nervous." R. 23, Ex. 3B, 10:00–10:05. At the same time, Officer Cox acknowledged that Taylor was doing what she had asked him to do. After Officer Cox directed Taylor to stop moving in his vehicle, he made

minimal movements until she came back to remove him from the driver's seat. Officer Cox testified that his head "remained stable" during that time. R. 25, PageID 236–38.

Notably, when requesting a K-9 unit, Officer Cox made no mention of Taylor's movements. She mentioned only Taylor's travel plans, criminal history, and air fresheners. When Taylor asked why he was being searched, Officer Cox explained that Taylor's travel plans were confusing to her, and she was informed of his criminal history.

True, we have, as the government argues, noted that reasonable suspicion exists when a person makes large movements in his vehicle, specifically where he "reaches his hand between the center console and the passenger seat *as officers approach*." *United States v. Ledbetter*, 929 F.3d 338, 347 (6th Cir. 2019) (emphasis added) (citation omitted); *see also United States v. McMullen*, 103 F.4th 1225, 1231 (6th Cir. 2024) ("The detectives observed [the defendant] reach for something . . . in response to their approaching truck."). But Taylor did not make any significant movements as Officer Cox stopped and then approached his vehicle. Instead, he did not start the movements until after she approached the vehicle, and directly in response to Officer Cox asking him to look for proof of insurance. And when Officer Cox told Taylor not to make any further movements, he stopped. We acknowledge that the cursory way that Taylor looked in his glove box and the center console for proof of insurance while Officer Cox stood next to his vehicle made her nervous. And that is a valid point in the analysis. But of greater importance, Taylor only made those movements when instructed by Officer Cox to look for insurance proof. This, along with Officer Cox's failure to contemporaneously mention the movements when she discussed her suspicions with the K-9 officer, decreases the weight of this factor.

Under the totality of the circumstances and viewing the facts in the light most favorable to the government, Officer Cox did not have reasonable suspicion to prolong the traffic stop. The reasonable-suspicion indicators are weak and subject to qualification. In fact, the district court recognized that Taylor's travel plans, criminal history, and air fresheners may not have been enough to establish reasonable suspicion. But it held that his alleged suspicious movements moved the needle enough to justify extending the stop.

We disagree.  Because Officer Cox prompted Taylor's movements and Taylor complied with her requests, that factor holds very little weight.  Similarly, Taylor's travel plans and air fresheners offer little, if anything, to the reasonable-suspicion analysis.  Adding his criminal history to the mix is insufficient to establish reasonable suspicion because it is combined with only these other weak indicators.  Ultimately, "this case lacks any of the stronger indicators of criminal conduct" typically necessary to establish reasonable suspicion.  *See Townsend*, 305 F.3d at 545.  The threshold for reasonable suspicion may be low, but it is not nonexistent.  Thus, we hold that Officer Cox lacked a reasonable, articulable suspicion of criminal activity that justified extending Taylor's stop to conduct a dog sniff.

## C.

To save the unconstitutional search of Taylor's vehicle, the government asks us to apply the good-faith exception to the exclusionary rule.  The Supreme Court created the exclusionary rule to deter Fourth Amendment violations.  *Davis v. United States*, 564 U.S. 229, 236–37 (2011); *Illinois v. Krull*, 480 U.S. 340, 347 (1987).  The rule generally bars the use of evidence obtained in violation of the Fourth Amendment "in a criminal proceeding against the victim of the illegal search and seizure."  *Krull*, 480 U.S. at 347 (citations omitted).  The Court also created the good-faith exception to cabin the exclusionary rule.  *Davis*, 564 U.S. at 238.  Thus, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful," the exclusionary rule does not apply.  *Id.* (internal quotation marks omitted).

The Supreme Court has endorsed the application of the good-faith exception in five circumstances.  Those are when officers: (1) reasonably and in good faith rely on a warrant subsequently declared invalid, *United States v. Leon*, 468 U.S. 897, 922 (1984); (2) perform a warrantless search in reliance on a statute later declared unconstitutional, *Krull*, 480 U.S. at 349–53; (3) act negligently in reliance on mistaken information from judicial or police employees indicating the existence of an outstanding warrant, *Herring v. United States*, 555 U.S. 135, 142 (2009); *Arizona v. Evans*, 514 U.S. 1, 14 (1995); and (4) act "in objectively reasonable reliance on binding appellate precedent," *Davis*, 564 U.S. at 232.

None of these circumstances applies here.  And we decline to extend the good-faith exception to the exclusionary rule to salvage unconstitutional *Terry* stops.

**IV.**

For the foregoing reasons, we **REVERSE** the district court's order denying Taylor's motion to suppress and remand for proceedings consistent with this opinion.