NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0232n.06

Case No. 24-3315

FILED
May 08, 2025
KELLY L. STEPHENS, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOHNNY STEVEN VANN,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: STRANCH, BUSH, and NALBANDIAN, Circuit Judges

**NALBANDIAN, Circuit Judge**. Ohio State Highway Patrol Trooper Jeffery Huffman pulled over Johnny Vann after Vann failed to use his turn signal while changing lanes. Huffman immediately noticed a strong smell of marijuana coming from the car and saw a dispensary bag in the car door. So he moved Vann and his passenger to a patrol car while he searched the vehicle.

Huffman found large quantities of meth, fentanyl, and other drugs. Vann was arrested and charged with drug trafficking offenses. He moved to suppress the drugs, arguing that Huffman lacked probable cause to pull him over, but the district court disagreed and overruled Vann's motion. So Vann pleaded guilty but reserved the right to challenge the motion-to-suppress ruling. He now appeals that ruling, and we AFFIRM.

**I.**

On April 15, 2023, Ohio State Highway Patrol (OSHP) Trooper Huffman was parked in a median surveilling traffic along the interstate. One car—a black sedan—stood out to him. The

car slowed down, as most do when they pass an officer, but it slowed to a speed that was both "under the speed limit" and slow "[r]elative to other cars." R.47, Hr'g Tr., pp.12–13, PageID 331–32. And as it passed, the driver made eye contact with Huffman and "almost looked like he had s[een] a ghost." *Id.* at p.14, PageID 333. Huffman thought this was abnormal behavior, and it piqued his curiosity, so he followed the car.

The interstate had three lanes. Huffman was in the middle lane behind an SUV that was, in turn, behind the black sedan, which he later learned Vann was driving. From his vantage point behind the SUV, Huffman saw Vann change to the left lane. According to Huffman, Vann did not use his turn signal while changing lanes. So Huffman moved to the right lane to pass the SUV while Vann kept driving under the speed limit in the left lane. Huffman then moved to the left lane to get behind Vann. As soon as he did, Vann changed lanes again, shifting into the middle lane—this time, using his signal. So Huffman got behind him again and turned on his lights to pull him over.

On the shoulder, Huffman approached Vann from the passenger side and immediately noticed "the strong odor of marijuana" coming from the car. *Id.* at p.26, PageID 345. Huffman told Vann that "when [he] went in the left lane, [he] never used [his] turn signal." Gov't Ex. 2, Huffman Body Worn Camera (Huffman BWC), 16:43:24–29. By this time, Trooper Matthew Born, who was on patrol nearby, also pulled over in case Huffman needed anything and stood near the driver's side door. Vann replied that the car was a rental, and Huffman again said he did not use his turn signal and asked to see his license. Vann didn't have it, so Huffman took the license of his passenger, Bridgit Ganskow, and asked Vann to step out of the car with Born while they worked to identify him.

As Vann exited the car, Huffman saw a bag from the "House of Dank," a Michigan marijuana dispensary, in the door. Huffman asked Ganskow what brought them to Ohio, and she said they were going to a dispensary. To her surprise, Huffman informed her marijuana was illegal in the state and they could not have it out in their car "like that," gesturing toward the bag. *Id.* at 16:45:20–35. He asked if she had a medical marijuana card, and she did not.[1] So he also had her step out of the car and join Born.

Huffman then searched the vehicle. He began by going through Ganskow's purse where he found marijuana, other cannabis products, needles, and Narcan. Moving to the items in the backseat, he found various pills, fentanyl, and a plastic bag with a large amount of crystal meth. Shocked by the quantity of drugs, Huffman called Born over to look. This left Vann and Ganskow alone in the backseat of the patrol car, where seemingly unaware the car had a camera, they discussed who should take the fall for the drugs. Vann told Ganskow that she should because their attorneys would "get it thrown out" anyway. R.47, Hr'g Tr., p.35, PageID 354; Gov't Ex 3, Backseat Camera, 17:10:24. When the officers returned, they arrested Vann and Ganskow.

Vann was indicted on three counts of possession with intent to distribute a controlled substance—one count in violation of 21 U.S.C. § 846 and two in violation of § 841(a)(1).[2] He moved to suppress all the evidence the government obtained in the traffic stop, arguing Huffman lacked probable cause to initiate the stop. The court held a hearing on the motion, and Huffman testified. He provided two bases for the stop: Vann did not signal while changing lanes, and he impeded traffic by driving in the left lane under the speed limit, without passing other cars. The

---

[1] At the time, only medical marijuana was legal in Ohio. *See* Ohio Rev. Code § 3796.03 (2023); *see also* Ohio Rev. Code § 2925.11(C)(3) (criminalizing recreational marijuana) (amended Oct. 3, 2023).

[2] The government also charged Ganskow for violating §§ 846 and 841(a), but she is not a party to this appeal.

3

government also introduced Huffman's dash camera recording of Vann's driving, the body camera footage of his interaction with Vann and Ganskow, and the patrol car footage of Vann and Ganskow's conversation in the backseat.

But the dash camera footage is not a complete picture of the incident. It shows Vann entering the left lane, but because the camera is positioned on the passenger side of the car, the SUV behind Vann blocked the view of Vann's rear lights. So the government also introduced a photo showing the driver's view from the car, and Huffman testified that he had a "clear line of sight of the left side of the car" from the driver's side. R.47, Hr'g Tr., p.17, PageID 336. And he saw that Vann did not use his signal.

Vann's attorney questioned Huffman on why he pulled Vann over, and no other motorists who appeared to be violating traffic laws, and why he only mentioned the turn-signal violation when he confronted Vann, and not the impeding-traffic violation. The attorney also cited a provision in the OSHP policy manual that "recommends that [an officer] verbally document traffic violations when [he] see[s] them in addition to [the] dash camera recording." *Id.* at p.44, PageID 363. She questioned why Huffman did not do this, as it would have provided real-time evidence of the traffic violations. Huffman questioned the practicality of the policy recommendation. It would require officers to manually turn on their body cameras in the car (rather than allowing it to automatically turn on as they exit the car). But then they'd have to wait for the ninety-second lag between the camera turning on and when it begins recording to narrate what they are seeing, even though this information is also communicated to dispatch. On redirect, the government pointed out that this policy is entirely discretionary.

After watching the videos and hearing Huffman's testimony, the district court concluded Huffman was credible and had probable cause to initiate the stop. The judge based that probable

cause on Vann's turn signal violation. But he expressed "no opinion" on whether probable cause could also be based on Vann impeding traffic by his slow driving in the left lane. *Id.* at p.82, PageID 401. While he believed the video showed that violation, he acknowledged that the officer never mentioned it to Vann and had raised it for the first time in his after-incident report. So it wasn't clear to the judge if "another violation that nobody talked about until the report" could also serve as probable cause for the initial stop. *Id.* at p.83, PageID 402. Still, he concluded "it's irrelevant" because testimony explained why the dash camera could not capture the turn-signal violation and Huffman "unequivocally testified that he could see where that turn signal was and [it] remained inactive" during the lane change—and that gave Huffman probable cause for the stop. *Id.* So the court declined to suppress the evidence.

Vann entered a plea agreement on two counts that allowed him to appeal the adverse motion-to-suppress ruling. He was sentenced to 120 months' imprisonment and five years of supervised release. He appealed.

## II.

When reviewing a motion to suppress, we review the district court's "findings of fact for clear error and legal conclusions de novo." *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024) (internal quotation marks omitted). And when a district court denies a motion, "we consider the evidence in the light most favorable to the government." *Id.* (internal quotation marks omitted). For a factual finding to be clearly erroneous, the record must leave us "with the definite and firm conviction that a mistake has been committed." *United States v. Rogers*, 97 F.4th 1038, 1041 (6th Cir. 2024) (internal quotation marks omitted). We will affirm a district court's conclusion if it "can be justified for any reason." *Id.* (internal quotation marks omitted).

**III.**

Vann's sole argument on appeal is really a factual dispute: he argues that Huffman could not see his turn signal violation and so lacked probable cause to initiate the stop. He claims the district court "ignored or discounted other evidence" showing that Huffman was not credible. Appellant Br. at 13. But because the record supports the district court's conclusion that Vann did not use his turn signal while changing lanes, Huffman had probable cause to pull him over.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. A person's car is an "effect" under the amendment. *United States v. Hockenberry*, 730 F.3d 645, 657–58 (6th Cir. 2013). So to justify a seizure, like a traffic stop, an officer must have "probable cause to believe that a traffic violation has occurred." *Id.* at 658 (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). Once an officer has probable cause, his "subjective intent is irrelevant." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (internal quotation marks omitted). And an officer has probable cause when he "observes a motorist violate a traffic law." *Id.* at 923.

Everyone agrees that Ohio requires a motorist use a turn signal when changing lanes. So the only question is whether Huffman observed Vann change lanes without using his turn signal. The record supports the district court's finding that he did. Although the dash camera video does not show Vann changing lanes without signaling, there is a clear explanation why. The dash camera is on the passenger side, so its sight line is different from the driver's. Though the SUV in front of Hoffman blocked the camera's view of the turn-signal violation, Hoffman could still observe the violation from the driver's side. The government introduced photos to show that, and Huffman testified to it. And the court acknowledged that the video did not capture the turn-signal violation but nonetheless credited Huffman's unequivocal testimony that he did not see Vann use

his signal when changing lanes. Aside from his testimony, Huffman also repeatedly raised the turn-signal violation to Vann when he pulled him over. So the record provides consistent and contemporaneous evidence that Huffman saw Vann fail to use his turn signal. Based on this record, the district court's factual finding was not clearly erroneous.

Vann fights this conclusion with a more nuanced pretext argument. He concedes that an officer's subjective intent is typically irrelevant to a probable-cause finding. But he contends that it is relevant to the district court's credibility determination. He claims that Huffman's other actions suggested that his suspicions of Vann prevented him from being a credible witness to the alleged violation. For support, he points to three things: (1) Huffman's "inconsistent[]" testimony about whether it is abnormal for a driver to slow down as they pass police, (2) the fact that Huffman did not follow the OSHP policy that recommends officers orally narrate suspected traffic violations, and (3) the fact that Huffman did not raise the second alleged traffic violation until his written report. Appellant Br. at 13–14. None of these arguments make the district court's credibility determination erroneous.

First, Huffman's testimony was far from inconsistent. He acknowledged that most drivers slow down when they see police. But Vann did more. Huffman testified that Vann "slowed down to a slow speed *under the speed limit*" that was also slow "[r]elative to other cars." R.47, Hr'g Tr., pp.12–13, PageID 331–32 (emphasis added). And when Vann made eye contact with Huffman, he "almost looked like he had s[een] a ghost." *Id.* at p.14, PageID 333. That is the conduct that stood out to Huffman as abnormal. But even if Huffman's testimony about normal driving behavior was inconsistent, it would not lead us to conclude the district court erred in crediting his testimony about a completely different topic—whether he saw Vann use his turn signal.

7

Vann's second argument fares no better. His attorney thoroughly raised the OSHP policy during the hearing. But as Huffman pointed out, it is unrealistic for officers to narrate each traffic violation aloud while driving alone. This is especially true since it would require officers to manually turn on the in-car video system and there is about a ninety-second delay before it begins recording. More importantly, as the government pointed out, this policy is entirely discretionary. So it isn't clear that Huffman's failure to follow this policy was evidence of malintent toward Vann.

Finally, Vann argues that Hoffman's failure to note the second violation until his report was a credibility defect the district court erroneously ignored. But the district court considered this. It noted that the video captured the violation, so it was not wrong for Huffman to include it in his report. The judge only disregarded the violation for establishing probable cause because he was unsure whether a violation mentioned only in the report can serve that purpose—not because he believed Huffman was dishonest about it occurring. So Hoffman's failure to note the second violation until his report was not a credibility defect. Plus, this fact was irrelevant. Huffman had already "unequivocally testified that he could see where that turn signal was and [it] remained inactive" during the lane change—and that provided Huffman probable cause to stop Vann. *Id.* at p.83, PageID 402.

Vann's new spin on pretext is unavailing. The record before the district judge supports his finding that Huffman had probable cause to stop Vann. And since that is Vann's only argument in favor of suppression, we affirm.