NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0247n.06

No. 24-1316/1319

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 29, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BILLY DARRELL ARNOLD, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: BOGGS, BATCHELDER, and MOORE, Circuit Judges.

**ALICE M. BATCHELDER**, **Circuit Judge**. On September 26, 2015, law enforcement arrested Billy Arnold after he left a party hosted by the notorious Seven Mile Bloods ("SMB") gang in Detroit, Michigan. This initial arrest set off years of superseding indictments and court proceedings, ultimately resulting in a jury's finding Arnold guilty in 2023 of, among other things, participation in a RICO conspiracy, murder, attempted murder, and various firearm offenses. The district court sentenced Arnold to more than five life terms in prison for his crimes. Arnold appeals. Finding no error, we **AFFIRM**.

**I.**

Billy Arnold, also known as "Killa," was a leading member of the SMBs—a gang that operated in an area of Detroit, Michigan, known as the "Red Zone." The SMBs engaged in various criminal activities, but their primary source of income came from an ongoing and ever-increasing drug-dealing business. And the gang was not shy about its illicit undertakings. Members created

rap videos and made social-media posts referencing drugs, murder, and firearms, and touting the success of revenge-driven activities they had carried out.

From 2003 to Arnold's final arrest in 2015, law enforcement arrested numerous SMB members associated with Arnold for illegal activities consistent with the drug-dealing business. These included, among other things, drug distribution, drug possession, firearm possession, and illegal home entry. Like many of his fellow gang members, Arnold was arrested several times from 2004 to 2006. Then, in 2007, Arnold was convicted of assault and illegal discharge of a firearm and, as a result, served more than five years in state prison.

While in prison, Arnold remained in contact with members of the SMBs. And when Arnold got out of prison in 2013, he resumed activities with the gang. Shortly after Arnold's release, tensions with a rival gang began to escalate.

In July 2014, a vehicle containing members of a rival gang was fired upon after they had left a parole meeting. One of the individuals in the vehicle, Djuan Page, was shot in the eye and died a few weeks later from his injury. Time stamps from Arnold's phone compared with cell tower pings placed Arnold in the vicinity of that shooting. And after the shooting, Arnold filmed a rap video of fellow gang members touting the "shooting [of Page] in the e-y-e."

Shortly after Page's death, the rival gang posted a "hit list" of numerous SMB members on social media, indicating its forthcoming efforts to get "revenge." Several SMB members were subsequently shot in a series of retaliatory shootings, including Devon McClure (a.k.a., "Block"), a "neighborhood favorite" member of the SMBs. Arnold and McClure were "close friends." Then, later in the day on May 1, 2015—the day McClure was shot—a rival-gang member was also shot.

A few days later, on May 8, a parked car carrying four rival-gang members was fired upon, leaving one of them dead. Around the time of the shooting, Arnold and another SMB member,

2

Keithon Porter—whose phones connected to the cell tower servicing the area where the incident took place—texted to each other street names near the location of the incident. Arnold also texted Porter before the shooting, "get in front of us," and, afterward, he texted McClure's girlfriend, "U should here bout it." Then, on May 10, Arnold texted a fellow SMB member, "lets wrap it up." Later that day, a car carrying rival-gang members was shot up and Arnold's phone had again connected to a cell tower near the shooting just before and after it occurred. Weeks later, on June 7, 2015, around the time of another shooting involving a rival-gang member, Arnold's phone once again connected to a cell tower covering the location of the incident.

Meanwhile, the FBI had been investigating the SMBs. Throughout the investigation, supervisory agent, Vicente Ruiz had gathered significant information about the gang's criminal activity and identified members of the SMBs, along with their addresses, criminal histories, and social media accounts. During his investigation, Ruiz discovered through a social media post that the SMBs planned to host a memorial party for McClure at the "Crazy Horse" nightclub in Detroit on September 25, 2015. Ruiz orchestrated a plan to surveil the nightclub and conduct traffic stops if certain SMB members arrived at the party.

Arnold, who had been identified as a person of interest, went to the club for the party. Law-enforcement officers were aware that the car he arrived in had been reported stolen. After Arnold and another gang member left the party in that vehicle later that night, law enforcement attempted to stop the vehicle. But instead of pulling over, the vehicle led the officers on a high-speed chase, at times exceeding 100 miles per hour, before its tires blew out and it eventually came to rest on an embankment. The driver of the vehicle fled on foot while Arnold remained seated in the vehicle and cooperated with police officers.

Law enforcement seized an AR-15 assault rifle and cell phones from the vehicle. Law enforcement could see the assault rifle in plain sight in the cargo area through the rear window of the car. The seized AR-15 was later linked to the casings found at the scene of the May 1, May 8, and May 10 shootings. Law enforcement also seized six cell phones: five from the vehicle and one from Arnold's person. Agent Ruiz later submitted an affidavit supporting a search warrant for the cell phones and obtained the requested warrant. After the chase, the vehicle was towed and the owner later consented to its search but clarified that the vehicle had not, in fact, been stolen.

A federal grand jury indicted Arnold in two cases. In Case No. 15-20652 (appeal No. 24-1316), the grand jury charged Arnold with RICO conspiracy under 18 U.S.C. § 1962(d) (Count 1); two counts of murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) (Counts 2, 10); two counts of using and carrying a firearm during and in relation to a crime of violence causing death under 18 U.S.C. §§ 924(c); 924(j)(1) (Counts 3, 11); eight counts of attempted murder in aid of racketeering under 18 U.S.C. § 1959(a)(5) (Counts 4, 5, 6, 8, 12, 13, 14, 16); four counts of using, carrying, and discharging a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A)(iii) (Counts 7, 9, 15, 18); assault with a dangerous weapon in aid of racketeering under 18 U.S.C. § 1959(a)(3) (Count 17); and being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) (Count 19). In Case No. 20-20187 (appeal No. 24-1319), the grand jury charged Arnold with three counts of attempted murder in aid of racketeering under 18 U.S.C. § 1959(a)(5) (Counts 1, 2, 3) and one count of using, carrying, and discharging a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A)(iii) (Count 4).

Arnold's first jury trial in 2022 ended with a guilty verdict on Count 19 but the court declared a mistrial on all other counts. Before that trial, Arnold had filed a motion to suppress the evidence extracted from the six seized cell phones and joined a motion to ban the admission of

certain rap videos. The district court denied both motions. In 2023, Arnold was tried a second time and a jury found him guilty on Counts One through Eighteen, listed above. Arnold's trial lasted over five weeks. It included hundreds of filings, exhibits, and testimony from numerous witnesses, including several co-conspirators. Agent Ruiz testified as a lay witness about the SMBs' members, territory, insignia, and activities.

The district court sentenced Arnold on all nineteen counts to five life sentences along with more than fifteen additional sentences of ten years or longer. Arnold appeals the judgment in both cases.

## II.

Arnold contends that the district court in his first trial erred by denying his motion to suppress the evidence extracted from the seized cell phones. When reviewing the denial of a suppression motion, "we review factual findings for clear error and legal conclusions de novo." *United States v. Rogers*, 97 F.4th 1038, 1041 (6th Cir. 2024). We review "the evidence in the light most likely to support the district court's [denial]" and we will affirm that denial "if the district court's conclusion can be justified for any reason." *Id.* (cleaned up).

The exclusionary rule prevents the government from using evidence obtained in violation of the Fourth Amendment's protections against unreasonable searches and seizures. *United States v. Taylor*, 121 F.4th 590, 598 (6th Cir. 2024). For the exclusionary rule to apply, a defendant must establish a reasonable expectation of privacy and assert "that *his own* Fourth Amendment rights were infringed" because "Fourth Amendment rights may not be vicariously asserted." *Rogers*, 97 F.4th at 1042 (cleaned up) (emphasis in original).

Law enforcement arrested Arnold after the car in which he was a passenger failed to pull over and led them on a high-speed chase. They seized one cell phone from Arnold's person and

five from the vehicle. While Arnold appears to argue for suppression of all six of the cell phones seized from the vehicle in which he was a passenger, he has standing to challenge only the phone taken from his person. His status as a passenger, standing alone, does not establish that he had a reasonable expectation of privacy in the vehicle and he has failed to provide some additional basis for us to conclude that he had a reasonable expectation of privacy in the car. *See Rogers*, 97 F.4th at 1042 (finding defendant did not have an expectation of privacy in a vehicle because he was only a passenger in it, never had dominion or control over it, and did not own or drive the vehicle). Arnold therefore failed to meet his burden to establish his standing to challenge the search and the five phones found in the vehicle.

So, the only cell phone remaining is the one seized from Arnold's person at the time of his arrest. Arnold alleges (1) that his phone was "fruit of the poisonous tree" derived from his wrongful arrest and (2) that Agent Ruiz's affidavit supporting the warrant used to search the contents of his cell phone is a "bare bones" affidavit because it contained "bald assertions" and failed to "describe the information upon which [his] conclusions were based." Neither argument has merit.

First, Arnold was not wrongfully arrested. An exception to the warrant requirement exists for a search incident to a lawful arrest. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). When evaluating whether a warrantless arrest was lawful, "[our] job is straightforward: we evaluate whether there was probable cause to believe that the suspect committed a crime or was in the process of committing a crime." *Fisher v. Jordan*, 91 F.4th 419, 424–25 (6th Cir. 2024). "Probable cause is not a high bar" and hinges on "whether an objectively reasonable officer would conclude that there is a probability or substantial chance of criminal activity, thereby justifying an arrest."

*Id.* at 425 (cleaned up). When law enforcement pulled over the vehicle in which Arnold was a passenger, they had probable cause to believe that Arnold was engaged in criminal activity.

A LEIN report indicated that Arnold was riding in a stolen vehicle. Although no published opinion in this circuit explicitly links a LEIN report to probable cause for an arrest, there is persuasive, nonprecedential authority indicating that it may be enough. *See United States v. Conley*, No. 21-1723, 2023 WL 165966, at *4 (6th Cir. Jan. 12, 2023) (explaining that "LEIN information is enough to establish probable cause" for a traffic stop); *see also Pop v. Brookfield Chrysler Dodge Jeep, Inc.,* No. 24-1201, 2025 WL 1010448, at *4 (6th Cir. Apr. 2, 2025) (citing *Conley* for the proposition that Michigan LEIN information could establish probable cause to arrest an individual found driving a car listed thereon as stolen). Regardless, here, there is more. The vehicle had just departed from a party hosted by the SMBs—a gang known for drug trafficking, violence, and firearms—and, when confronted by police, the vehicle sped away at speeds exceeding 100 mph. And after the vehicle's tires blew out, the driver fled on foot. Collectively, the circumstances that occurred right in the presence of the officers further contributed to probable cause to arrest Arnold. *See Maryland v. Pringle*, 540 U.S. 366, 373 (2003) ("a car passenger . . . will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing") (cleaned up); *United States v. Jacob*, 377 F. 3d 573, 579-80, n.3 (6th Circ. 2004).

Moreover, as an independent justification for Arnold's arrest, law enforcement discovered an assault rifle in the vehicle minutes after they detained Arnold. The officers initially detained Arnold after executing a valid *Terry* stop based upon a "reasonable suspicion of criminal activity." *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008). The assault rifle in plain sight made the subsequent search of the vehicle lawful. *See Michigan v. Long*, 463 U.S. 1032, 1050-51 (1983)

(explaining that police may conduct an area search pursuant to a *Terry* stop if "they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous" and if the officer finds contraband, "he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances"). Discovering the assault rifle gave law enforcement probable cause to arrest Arnold as a felon in possession of a firearm. Therefore, the police lawfully arrested Arnold without a warrant.

Second, Arnold's challenge to the validity of the warrant used to extract information from his seized phone also fails. A search warrant must be supported by probable cause based on the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Based on those circumstances as set forth in an affidavit, probable cause exists if the affidavit contains "a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. In other words, there must be "a nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). Conversely, a "bare bones" affidavit is one "that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[.]" *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39 (citation modified).

The issuing magistrate had a substantial basis to find probable cause that Arnold's seized cell phone contained evidence of criminal activity. Agent Ruiz's affidavit supporting the warrant detailed criminal organizational trends and activities and was based on his experience investigating the SMBs and other criminal enterprises. Ruiz outlined the precise location (including the town and mile markers in each direction) where the SMBs operate, *i.e.*, the "Red Zone," along with gang

8

indicia within that area. Ruiz noted interviews that law enforcement had conducted with suspects, victims, and witnesses who had been involved or associated with the SMBs, which revealed criminal conspiracies to commit murder, armed robbery, and narcotics trafficking from 2005 through 2015. The interviews identified "multiple specific acts of violence" that could be independently corroborated by police and social media reports. Ruiz also described, at various points throughout his affidavit, how cell phones played an integral role in the gang's activity. He explained that drug-trafficking communications are "accomplished through the use of cellular phones, specifically text messages and/or calls between the participants" and that those phones often maintain an "address book" with customers and criminal allies. Ruiz also stated that incarcerated SMB members contacted non-incarcerated members through the latter's cell phones.

Moreover, Ruiz explained that law enforcement had been monitoring SMB members' social media accounts: "members are utilizing their cell phones to post photos and videos to their accounts depicting gang names, colors, and hand signs, memorials to dead gang members . . . [and] criminal activity [] including convicted felons in possession of firearms, and possession and use of illegal narcotics." The affidavit specifically referred to an Instagram account named "000_big_blood," which referenced and celebrated the murder of a rival-gang member, Djuan Page. As just one example, the Instagram page contained a collage of pictures from Page's funeral, along with the comment, "Kaught him at DA light like Kusin Harold." In sum, Ruiz's affidavit contained substantial, detailed information connecting the SMBs' use of cell phones to the gang's criminal activity, therefore creating a "probability that . . . evidence of a crime [would] be found" on the seized phones. *Gates*, 462 U.S. at 238.

While Arnold focuses on what the affidavit allegedly lacks, "[w]e ask what good qualities it contains, not what it lacks." *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (en

banc) (cleaned up). Ruiz's affidavit contains ample evidence supporting the magistrate's determination that probable cause existed to believe Arnold's phone contained evidence of the target offenses.

### III.

Arnold also alleges various evidentiary errors throughout his trial with differing standards of review. None of his arguments has merit.

#### A. Judicial Bias

Arnold urges us to review for abuse of discretion his judicial bias claim because we "might review for abuse of discretion where counsel reasonably withholds objections to avoid inciting additional hostility from the judge." *United States v. Davis*, 361 F.App'x 632, 634 (6th Cir. 2010). But Arnold presents no evidence, or even an argument, that the judge demonstrated judicial hostility that affected his attorney's trial conduct. We review for plain error Arnold's unpreserved judicial-bias challenge. *United States v. Bankston*, 820 F.3d 215, 233 (6th Cir. 2016).

"[T]he judge is not a mere moderator;" rather, the judge is "the governor of the trial for the purpose of assuring its proper conduct." *United States v. Hickman*, 592 F.2d 931, 932 (6th Cir. 1979). Therefore, "[i]n a lengthy, complex trial, intervention by the judge is often needed to clarify what is going on." *Id.* at 933. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky v. United States*, 510 U.S. 540, 556 (1994). This supervisory role manifests itself in various forms. *E.g.*, *Cox v. Treadway*, 75 F.3d 230, 237 (6th Cir. 1996) (interrupting opening statements to admonish counsel for arguing her case).

Arnold alleges two instances of judicial bias. First, he contends that the court impermissibly interfered with his attorney's opening statement. During that opening statement,

Arnold's attorney stated that Arnold "was not even convicted of the lead charge" in one of his previous cases. The court called a sidebar and expressed concern about discussing prior charges from another case because "an opening statement is [about] what the evidence is going to show" and "there may be certain relevance to other criminal cases, but we're not going to be trying [those] other cases here in this case." Arnold's attorney clarified that he was "not going there anymore" and would instead focus on a witness's testimony. The court then stated, "I apologize for interrupting your opening," and explained the reason for the interruption: "I was just kind of confused about going down that road." Arnold's counsel proceeded as he had indicated and focused on the testimony of a forthcoming witness. The district court did not plainly err by intervening in defense counsel's opening statement to "clarify what [was] going on" regarding counsel's reference to one of Arnold's previous cases. *Hickman*, 592 F.2d at 933.

Second, Arnold argues that the court improperly intervened during the government's direct examination of one of its witnesses by telling the government, at a brief sidebar, that it was "going too fast." The court intervened because it was "looking at the jury [to see] if they were paying attention." *Id.* This falls squarely within the court's "ordinary efforts at courtroom administration" and far from the sort of judicial interventions we have found impermissible. *Liteky*, 510 U.S. at 556; *see also Hickman*, 592 F.2d at 936 (finding judicial bias because the "*only impression* which could have been left in the mind of the jury was that the trial judge was a surrogate prosecutor" based on the judge's "*constant interruptions* which frustrated the defense at *every* turn and infringed upon defendants' rights of cross-examination") (emphasis added).

Arnold's trial lasted over five weeks and spans thousands of pages of transcript material. The two isolated interjections that Arnold challenges both occurred at a sidebar and constitute a

11

proper use of the court's discretion to intervene as necessary to ensure that the trial proceeded smoothly.

B. Summary Exhibits

We review for abuse of discretion the district court's admission of summary exhibits. *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998). Arnold takes issue with two summary exhibits that the government introduced at trial. He argues that the exhibits unfairly prejudiced him by helping the government "establish the key element [it] had the burden of proving," *i.e.,* that an "enterprise" existed among him and other SMB members under RICO. The first exhibit displayed the driver's license photos of 35 SMB members with theirs names and nicknames listed below each photo (Exhibit 3.0). The second exhibit contained a photo of six SMB members, along with each member's name and a phone number associated with him (Exhibit 167.0).

The district court may control the "mode and order" of presenting evidence to "make those procedures effective for determining the truth" and to "avoid wasting time." Fed. R. Evid. 611(a). One way the court may do this is by allowing a party to introduce a summary or chart to "prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006(a). This does not mean that the summarized material must be "literally impossible to examine" without an exhibit. *Bray*, 139 F.3d at 1109. As is the case with any relevant evidence, a court may exclude the chart or exhibit "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403. The Rule 403 test is "strongly weighted toward admission" and we view the evidence in the light most favorable to the proponent. *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).

Regarding Exhibit 3.0, the district court concluded that it would be "more productive and easier for the jury to follow the photographs and names on one sheet of paper with two sides"

rather than "having a book of [individual] photographs." The court also instructed the jury that "just because these individuals happen to have their photographs on the same page of this exhibit does not mean that they are associated with each other." Considering the amount of information involved in Arnold's trial, the court's conclusion makes sense. Ultimately, the court provided a curative jury instruction, the exhibit itself did not indicate the existence of an enterprise, and the chart undoubtedly helped the jury keep track of the various parties involved in Arnold's lengthy and complex trial. The court did not abuse its discretion by admitting Exhibit 3.0.

As for Exhibit 167.0, the district court admitted it as a demonstrative exhibit only because it "would seem that it would make the testimony of the agent that's coming out shortly much easier to follow and would help prevent confusion." The government later distributed the exhibit to the jury while the testifying agent described the activities and locations associated with the listed phone numbers. The agent repeatedly referenced the phone numbers, focused on specific numbers, and described the locations of the phone associated with the numbers as provided by cell towers. Like Exhibit 3.0, Exhibit 167.0 helped the jury keep track of the agent's testimony referencing names, nicknames, and cell phone numbers that would have otherwise been even more difficult to keep organized. The district court did not abuse its discretion.

C. Case Agent's testimony

Arnold alleges two errors stemming from Agent Ruiz's testimony. First, that the court should have required that he be qualified as an expert. Second, that the court should have prevented him from interpreting gang-related communications during his testimony. We generally review for abuse of discretion a district court's evidentiary rulings. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). Where no objection is raised at trial, however, we review for plain error. *United States v. Seymour,* 468 F.3d 378, 387 (6th Cir. 2006).

### 1. Lay Witness Testimony

The government called Agent Ruiz to testify as a fact witness. Arnold contends that Ruiz's testimony addressing the contents of phone extractions, the SMBs' territory, graffiti, social media use, symbols, tattoos, numbers used to identify themselves, use of the name "Red Zone," and the existence of other gangs on the east side of Detroit constitutes impermissible expert testimony. We review for plain error because Arnold did not object to the testimony at trial. *Seymour,* 468 F.3d at 387.

A lay witness may offer opinion testimony if it is "[1] rationally based on the witness's perception; [2] helpful to clearly understanding the witness's testimony or to determining a fact in issue; and [3] not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rather than relying on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702(a), Agent Ruiz based his testimony on his personal perception and extensive experience investigating the SMBs—he interviewed witnesses, watched rap videos recorded by members of the SMBs, read their social media posts, and listened to their phone calls. *See United States v. Ledbetter*, 929 F.3d 338, 350 (6th Cir. 2019); *Kilpatrick*, 798 F.3d at 381. The district court did not plainly err in allowing Agent Ruiz to testify as a lay witness. As we stated in a parallel case concerning some of Arnold's co-conspirators, "given the substantial evidence in the record before us, it is reversing—not affirming—that would cast doubt on the fairness, integrity, and public reputation of judicial proceedings." *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *19 (6th Cir. July 5, 2022).

### 2. Gang-Related Communications

"When it comes to interpreting language from intercepted communications, an agent can be helpful when she uses her personal knowledge of the case to interpret cryptic language."

*Kilpatrick*, 798 F.3d at 380. That is exactly what Agent Ruiz did here. For example, when Agent Ruiz explained that a text referring to "milli" could mean a 9mm or 10mm firearm, he relied on his personal experience investigating the SMBs to aid the jury in understanding what was, indeed, a "cryptic," unusual manner of communicating: "Bitch y u aint drop da pocket boy off its hard walkin roun wit da milli wit dese small ass shirts on."

Unlike situations in which we found that the case agent improperly provided lay testimony by primarily interpreting text messages that were "nearly devoid of any [] specialized language," *United States v. Glenn*, 146 F.4th 485, 491 (6th Cir. 2025), Agent Ruiz relied on his experience to identify gang members' nicknames referenced in text messages, interpret cryptic terms such as "milli" and "blow," and explain the processes by which he extracted GPS information from cell phones. Moreover, Agent Ruiz often read text messages directly off a screen into the record without offering commentary regarding its meaning or significance, thereby allowing the jury to reach conclusions it was "competent to reach on its own." *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013). The district court did not abuse its discretion by allowing Agent Ruiz to utilize his experience to explain various aspects of the operations of the SMBs, including the way gang members communicated with each other.

D. Admission of Rap Lyrics

Arnold argues that the district court abused its discretion under Federal Rule of Evidence 403 by admitting certain rap lyrics. We typically review for abuse of discretion a district court's Rule 403 determinations. *United States v. Johnson*, 24 F.4th 590, 605 (6th Cir. 2022). But Arnold did not object to the admission of any of the lyrics that he challenges on appeal. So, we review for plain error. *Seymour,* 468 F.3d at 387.

Arnold alleges three instances where the court improperly admitted rap lyrics at trial.[1] First, the government presented a YouTube video called "Welcome to Hob City," which included members of the SMBs rapping and "clips from the news about [a] young man that got killed." Second, the government presented a recorded jail call in which Arnold was rapping (Exhibit 50.36). His "freestyle" raps included references to the nicknames of SMB members, certain SMB rituals to memorialize the dead, and firearms. Third, the government presented a video filmed by Arnold in which he was "constantly commenting as other [SMB members] are freestyle rapping" about, among other things, "shooting [a victim] in the e-y-e," likely alluding to the victim of an SMB shooting victim (Djuan Page) who had been shot in the left eye (Exhibit 56.22).

Regarding Exhibit 36.1, the record shows that the government "had discussed [the video] with [Arnold's] counsel" before trial, the parties had "agreed on [admitting] a shorter version" of the video, and when the time for admission came, Arnold confirmed that he had "no objection." In any event, the district court did not plainly err by admitting the rap lyrics or videos. *See United States v. Stuckey*, 253 F. App'x 468, 483 (6th Cir. 2007) (concluding that the district court did not abuse its discretion under Rule 403 in admitting rap lyrics referencing firearms, killings, and drugs, even though the defendant was on trial for offenses of that nature). Although the lyrics' disturbing content carried a risk of unfair prejudice, it also had significant probative value.[2] The charges against Arnold hinged on the government's ability to show Arnold's involvement with an

---

[1] While Arnold correctly points out that he joined a motion filed by one of his codefendants seeking to preclude the government's use of rap lyrics and rap videos during trial, only one of the three rap videos he now complains about was included in that motion (Welcome to Hob City). In any event, although it has no bearing on our analysis here, the district court denied the motion.

[2] As we said in a parallel case addressing one of Arnold's codefendants: "the [rap] videos also had substantial probative value. To prove its case, the government needed to show that SMB was an enterprise and that the racketeering acts—including murders and attempted murders—related to that enterprise. The rap videos were critical evidence that helped establish both. In the videos, some defendants trumpet their membership in SMB and describe specific acts committed by the group, including lyrics about shooting someone in the 'e-y-e.'" *Bailey*, 2022 WL 2444930, at *13 (cleaned up).

16

enterprise engaged in racketeering activity. The admitted videos and recorded call provided evidence of Arnold's intimate involvement with the SMBs and the gang's criminal activity, and included details that only someone with first-hand knowledge of a specific crime would more likely know (*i.e.*, gunshot through the "e-y-e").

### E. Federal Rule of Evidence 801 Admission

Arnold argues that the district court improperly admitted the hearsay statement of one of his co-conspirators implicating him in a murder. We review for clear error whether the government met the three prerequisites to admission under Federal Rule of Evidence 801(d)(2)(E); we review de novo the court's ultimate legal conclusion regarding admissibility. *United States v. Warman*, 578 F.3d 320, 335 (6th Cir. 2009).

A statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). "To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made in furtherance of the conspiracy." *United States v. Bailey*, 973 F.3d 548, 560 (6th Cir. 2020). "Statements [made during a conspiracy] identifying other conspirators and their roles in the conspiracy further the conspiracy." *Id.* at 561 (cleaned up). And "[w]here the admissibility is a close call, the trial judge's findings should generally remain undisturbed." *Id.* at 560 (citation omitted).

One of Arnold's co-conspirators, Derrick Kennedy, testified about a statement that he had heard from another conspirator implicating Arnold in the shooting of a rival-gang member. Before Kennedy testified, Arnold's counsel objected on hearsay grounds. The government explained that it was offering the testimony under Rule 801(d)(2)(E), that "the caselaw indicate[d] that

17

coconspirator statements include statements where members of the conspiracy advise other members of the conspiracy of events that took place," and that he believed "that's exactly where this falls in." Arnold's counsel reiterated that he "[didn't] believe that falls into that category." The court then concluded that it "seems within the coconspirator exception" and allowed Kennedy to continue his testimony.

Arnold faults the district court because it "put no such reasoning on the record" and "summarily adopted the prosecutor's argument" without articulating a specific Rule 801 analysis. But the government provided its reasoning for its belief that Kennedy's testimony did not qualify as hearsay under Rule 801. By agreeing, after considering both parties' positions, that Rule 801 applied, the court implicitly adopted the government's reasoning. Regardless, the government's position was correct. The first two elements of admissibility under Rule 801 had already been conclusively established throughout trial—that Arnold was a member of an existing conspiracy— and Kennedy's testimony identified a part of Arnold's "role[] in the conspiracy" and thus "further[ed] the conspiracy." *Bailey*, 973 F.3d at 560. Even if admissibility was a close call, we defer to the district court's findings. *Id.* Moreover, we made a similar Rule 801 determination in the companion case addressing the same argument raised by Arnold's co-conspirators. *Bailey*, 2022 WL 2444930, at *13.

F. Cumulative Errors

Arnold's last effort on appeal is his argument that the cumulative effect of the alleged errors warrants a reversal of his convictions and sentences. "The cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial. In order to obtain a new trial based upon cumulative error, defendants must show that the combined effect of individually harmless errors was so prejudicial as to render their trial fundamentally unfair." *United States v.*

*Collins*, 799 F.3d 554, 599 (6th Cir. 2015) (citation omitted).  Arnold failed to demonstrate any error in his challenges to comparatively minor aspects of this extensive trial, let alone that these purported errors rendered the trial fundamentally unfair.

## CONCLUSION

Based on the foregoing, we **AFFIRM** the judgment of the district court.